Filed 3/11/14  Nelson v. Time Inc. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| REEVES NELSON, | B245412 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC485194) |
| v. | |
| TIME INC. et al., | |
| Defendants and Respondents. | |

APPEAL from an order and a judgment of the Superior Court of Los Angeles County, Mary Ann Murphy, Judge.  Affirmed in part, reversed in part.

Fink & Steinberg, Keith A. Fink, S. Keven Steinberg and Olaf J. Muller for Plaintiff and Appellant.

O'Melveny & Myers, Daniel M. Petrocelli, Marc Feinstein, Madhu Pocha and Jonathan Hacker for Defendants and Respondents.

# INTRODUCTION

In March 2012, Sports Illustrated published a highly critical exposé of the University of California at Los Angeles (UCLA) men's basketball program. The article purported to tell "a cautionary tale of how discipline problems and mistakes in judgment can sabotage even a storied program," attributing the team's recent poor performance to coach Ben Howland's tolerance of misbehavior by a group of "talented but immature" freshman players. The article characterized Reeves Nelson, who recently had been dismissed from the team, as the "ringleader" of this group of young players, and it described his alleged aggression towards and bullying of his teammates in great detail.

Following the article's publication, Nelson sued Sports Illustrated's publisher, Time Inc. (Time), and journalist George Dohrmann, asserting that the article's description of his conduct was false and defamatory. Defendants filed a special motion to strike under the anti-SLAPP (strategic lawsuit against public participation) statute, Code of Civil Procedure section 425.16.[1] Defendants contended that Nelson's causes of action arose from actions in furtherance of their rights of free speech, and that Nelson could not demonstrate a likelihood of prevailing because he could not prove actual malice. The trial court agreed and granted the motion to strike.

We reverse in part. Among other things, the article says that Nelson admitted some of the misconduct it describes—an admission that Nelson denies. If a jury believes Nelson did not make the statements attributed to him, it could conclude that defendants' false attribution was made with knowledge of the falsity or reckless disregard for the truth. Accordingly, Nelson has established a prima facie case of defamation and false light, meeting his burden to defeat the anti-SLAPP motion as to those causes of action.

---

[1] All subsequent undesignated statutory references are to the Code of Civil Procedure.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.       The Sports Illustrated Article:  "*Special Report*":  "*Not the UCLA Way*"**

In its March 5, 2012 issue, Sports Illustrated published an article written by Dohrmann titled "*Special Report*":  "*Not the UCLA Way*" (the article).  The article reported that UCLA's basketball team had begun "veering off the rails" after the 2007-2008 season as team unity eroded and "the blocks of [John] Wooden's Pyramid [came] tumbling down."  The article reported that Sports Illustrated had spoken with more than a dozen players and staff members from the past four UCLA teams who "portrayed the program as having drifted from the UCLA way" because coach Ben Howland allowed an influx of "talented but immature recruits to undermine team discipline and morale. Fistfights broke out among teammates.  Several players routinely used alcohol and drugs, sometimes before practice.  One player intentionally injured teammates but received no punishment."  The team's struggles, the article said, "tell a cautionary tale of the risks of recruiting hyped players, the challenges of managing recalcitrant teenagers and the consequences of letting discipline and accountability break down."

Among the young players highlighted in the article was plaintiff Reeves Nelson, who joined the team in 2009.  Because the article's description of Nelson's conduct during the years he played basketball at UCLA is at the heart of this defamation action, we quote it at length:

"In the fall of 2009, during a routine practice drill, UCLA freshman Mike Moser ran through a team of defenders and was suddenly hit in the chest by a forearm and shoulder that nearly knocked him to the ground.  It was the second time Moser had been the victim of an illegal screen from fellow freshman Reeves Nelson, and he'd had enough.  Moser told Nelson that if he did it again he would punch him in the face.  The drill was reset, and in the words of one player who was present, 'Mike comes across and Reeves just hits him again.  Mike wasn't a guy who would back down.  He squared up and they went at [it].'

3

"Fights in practice happen; competitiveness gets the better of players. But according to team members, UCLA had an alarming number of those to begin the season. A year after bringing in the Baby Bruins [Jrue Holiday, Malcolm Lee, Jerime Anderson, Drew Gordon and J'mison Morgan], Howland had added five more freshmen, all frontcourt players: Moser, Nelson, Tyler Honeycutt, Brendan Lane and Anthony Stover. . . . With so many gifted young athletes on the team, a dustup or two could be expected in the competition for playing time. But when does a fight signal larger issues?

"Is it when the scuffle occurs away from practice, like the one between Nelson and Gordon at a teammate's apartment? Gordon ended up with a black eye. Is it when players are involved in multiple fights? Gordon and Moser had fought previously during a workout. Is it when a player says Howland made light of one of his players receiving a punch to the face? After what happened between Moser and Nelson, one player says that Howland jokingly remarked to him that Howland had been wanting to hit Nelson for weeks. (When asked about the incident, Howland said, 'I have never so much as contemplated striking a player in my 30 years as a coach. To think otherwise is ridiculous.') [¶] . . .

"As in the previous season, the problems started almost immediately. . . . Nelson and Stover . . . partnered with Gordon, Anderson and Morgan to form a crew that would further erode team discipline and unity. [¶] . . . [¶]

"Nelson was the ringleader among the freshmen. Because of his toughness, the 6'8" forward from Modesto, Calif., was called 'the prototypical Ben Howland player' by ESPN.com when he signed with the Bruins, but teammates came away with a different impression of him after only a few practices. Nelson could be a nice guy, but he had what one player calls 'this crazy side.'

"Nelson often reacted to hard fouls or calls against him in practice by committing violent acts against teammates. He did not deny to [Sports Illustrated] that he would stalk his targets, even running across the court, away from a play, to hit someone.

"Once, Nelson got tangled up with forward James Keefe while going for a rebound. Keefe was playing with a surgically repaired left shoulder, and Nelson pulled

4

down suddenly on Keefe's left arm. That reinjured Keefe's shoulder, and he missed several weeks. Later in the season Nelson hacked walk-on Alex Schrempf, the son of former NBA player Detlef Schrempf, from behind on a breakaway, knocking Schrempf to the ground. The back injury Schrempf suffered sidelined him for months. In another workout Nelson threw an elbow at Lane after the whistle, injuring Lane's ribs.

"Walk-on Tyler Trapani was another Nelson victim. After Trapani took a charge that negated a Nelson dunk, Nelson went out of his way to step on Trapani's chest as he lay on the ground. Trapani is John Wooden's great-grandson. (Nelson confirmed all these incidents to [Sports Illustrated] and expressed his regret, saying, 'On all that stuff, I have no trouble admitting that I lost control of my emotions sometimes. I take responsibility for my actions. I'm really just trying to learn from the mistakes I made on all levels.')

"After each of the incidents, Howland looked the other way. One team member says he asked Howland after a practice why he wasn't punishing Nelson, to which he said Howland responded, 'He's producing.'

"But at what cost? Nelson was hardly the player around whom to build a team. He was a classic bully, targeting teammates who weren't as athletically gifted as he and tormenting the support staff. At the end of practice, he would punt balls high up into the stands at Pauley Pavilion, turn to the student managers and say, 'Fetch.' Nelson frequently talked back to the assistant coaches. When they told him to stop, he would remark, 'That's how Coach Howland talks to you.'

"Many players say Howland degraded his assistants, but only Nelson used that as license to treat the assistants with disrespect. Donny Daniels, a member of Howland's staff since Howland arrived in Westwood, would leave after the season to take the same job at Gonzaga. One player says that when he asked Daniels why he was departing, Daniels kiddingly responded that if he had to coach Nelson for one more season, he would kill himself. (Daniels, through his lawyer, denied making that statement.)

"Nelson showed Howland only slightly more respect. By his own admission, he often ignored the head coach's phone calls, and Howland resorted to calling one of Nelson's roommates, asking him to coax Nelson onto the line.

"When asked by [Sports Illustrated] why he didn't discipline Nelson, Howland said in a statement: 'I firmly believe in the philosophy of giving all of my players the chance to do things the right way. There have been challenges with some student-athletes during my tenure here at UCLA, and we have utilized plenty of resources to help them, the specifics of which very few people would know anything about.'

"But Nelson's behavior—and Howland's tolerance of it—undercut team morale. Combined with the partying of the other freshmen and the three sophomores, it torpedoed the season. UCLA won four of five against weak competition to open the year but then lost six of its next seven . . . . [¶] . . . [¶]

"When [Howland announced that none of the players would be allowed to go out on a 'party bus' players had reserved for New Year's Eve], some underclassmen . . . conclud[ed] that they had an informant in their midst. Nelson thought that Honeycutt, one of his roommates, was the rat, and he got his revenge. A short time later, Nelson returned home from a night of partying, piled Honeycutt's clothes on Honeycutt's bed, and then urinated on the clothes and flipped the bed over. When asked by [Sports Illustrated] about the incident, Nelson said, 'I would dispute that that is exactly what happened, but I understand people would say that is what happened. But I think, most of all, you should know that Tyler and I are still friends.'

"It didn't appear that Nelson was punished for the incident, but players say that Honeycutt was given his own single dorm room. (Through his agent, Honeycutt declined to comment.) [¶] . . . [¶]

"From the first practice [of the 2010-2011 season], Nelson's treatment of [guard Matt] Carlino was a divisive issue. Carlino suffered a concussion during the preseason that caused him to miss the first three games. Nelson ridiculed Carlino for letting the injury sideline him. He told Carlino he didn't belong at UCLA and wasn't any good. He would yell at Carlino to leave the locker room, calling him 'concussion boy.' When

Carlino returned to workouts, Nelson would go out of his way to set a screen on Carlino so he could hit him. Eventually, players say, Carlino dreaded practice. It was of little surprise when he left UCLA midway through the season and transferred to BYU.

"After Carlino left, there was a team meeting at which Howland said he couldn't respect a quitter. 'But everyone knew why Matt left,' says one player. 'He didn't want to keep sitting on the bench, but most of all he didn't want to be around Reeves anymore. . . .'  [¶]  . . .

"Early in 2011, after the conference season began, players noticed a subtle shift in how Howland handled the mercurial Nelson. '[Howland] always gave Reeves the benefit of the doubt on foul calls in practice so Reeves wouldn't lose it and be even more disruptive,' says one team member. 'But when Reeves started going up against [forwards David and Travis Wear], Coach would call it straight. That got to Reeves. He started yelling more at Coach, showing him up.'

"Nelson finished his sophomore season as the team's leading scorer (13.9) and rebounder (9.1) and was selected first team All-Pac-10. He was a preseason first-team pick last fall, but he lasted only seven games.

"On Nov. 14, Howland suspended Nelson for being late to a team meeting and exhibiting other behavior that was deemed insubordinate. Howland reinstated Nelson two days later, but on Nov. 19 Nelson missed a team flight to Hawaii. Howland suspended him again on Dec. 6, a move that was roundly criticized by the media for being inadequate. Three days later, Howland dismissed Nelson from the program.

"Nelson's mother, Sheila, told the *Los Angeles Times* that she wished Howland had been stricter with her son earlier in his career. 'I think what my mom was saying was that when I went to college I was just 17,' Nelson, who is back in Modesto training for the NBA draft, told [Sports Illustrated]. 'I'm not trying to make excuses for what I did, but I got into some weird behavior patterns, and I think my mom was saying that if instead of one big punishment at the end, what if there had been smaller punishments along the way.' In a December interview with the *Los Angeles Times*, Howland acknowledged that he had made mistakes with Nelson."

## II.     The Present Action

Nelson filed the present action against Dohrmann and Time on May 23, 2012, alleging causes of action for defamation, false light, and intentional infliction of emotional distress. The complaint alleges that the article's characterization of Nelson and its recounting of specific instances of Nelson's misbehavior were false, as confirmed by declarations of 18 current or former UCLA basketball players. Further, defendants "twisted around quotes from Plaintiff Nelson to Defendant Dohrmann as well as four-month-old quotes given by Plaintiff's mother Sheila to the Los Angeles Times to make it appear as if both confirmed the article's contentions about Plaintiff." Defendants "failed to contact numerous obvious witnesses who could have confirmed or disproved the allegations in the article" and "published the false characterizations and recounting of events about Plaintiff when there were obvious reasons to doubt the veracity of their informants and/or accuracy of their informants' reports." Thus, defendants "published the article either with knowledge that it was false and defamatory" or "with reckless disregard for its obvious falsity and defamatory nature."

## III.     Defendants' Special Motion to Strike

### A.     Motion

Defendants filed a special motion to strike under the anti-SLAPP statute on August 13, 2012. Defendants asserted that all Nelson's causes of action arose from statements published in the article and, thus, constituted acts "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" within the meaning of the anti-SLAPP statute. (§ 425.16, subd. (b)(1).) Further, defendants contended Nelson could not demonstrate through competent, admissible evidence a reasonable probability that he would prevail on the merits. To establish a cause of action for defamation, defendants said, Nelson must establish "'a false and unprivileged publication that exposes [him] "to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or

8

which has a tendency to injur[e] him in his occupation.”’” Where a defamation plaintiff is a public figure or a limited public figure, the Constitution also requires proof of actual malice—i.e., proof that defendant made the statement with knowledge that it was false or with reckless disregard for the truth.

Defendants urged that, as a player for a high profile college basketball team, Nelson was a limited purpose public figure. Further, relying on the declarations of Dohrmann and his editor, Bruce Schecter, defendants asserted that Nelson could not demonstrate actual malice because they had substantial support for the statements and believed them to be true.

### 1. Declaration of Bruce Schecter

Schecter is an executive editor for Sports Illustrated and supervised Dohrmann’s work on the article. He said that during the investigation and writing of the article, he and Dohrmann had frequent conversations about Dohrmann’s investigation. Typically, immediately after he finished an interview, Dohrmann “called me and we went over the identity and background of the source, what was discussed, whether the source was confidential, other substantiation for the facts provided by the source, new leads, or other avenues for further investigation.” Schecter understood that many of the sources wished to remain anonymous because of their relationship with UCLA or for other reasons.

Schecter said that as part of the writing and editing process, he and Dohrmann “went over the Article line-by-line, and reviewed the support for all the statements in the Article relating to Reeves Nelson.” Before the article was published, Schecter “became very familiar with the identity, nature and number of the sources for those statements.” Schecter also supervised the fact-checking of the article. As part of the fact-checking, “[Sports Illustrated] compiled numerous news articles from other publications referring to Nelson, which reported that he had a history of disciplinary problems. These articles included reports that Nelson was suspended from his high school basketball team for poor behavior. . . . They also included reports that Nelson had twice been suspended and ultimately dismissed from the UCLA basketball team for insubordinate conduct. . . . In

addition, consistent with standard practice at [Sports Illustrated], an experienced fact-checker confirmed other facts in the Article by, for example, consulting publicly available sources of information. I was in regular communication with the fact-checker during this process, and I believe that the Article was carefully and thoroughly reviewed for accuracy and that each fact was checked."

Schecter said Dohrmann reported that he had spoken to Nelson about the article and had reviewed with him all of the parts of the article discussing Nelson's conduct. Nelson "confirmed all those incidents and expressed his regret." Further, Schecter and Dohrmann discussed "that any person or entity portrayed negatively in the Article should be contacted if possible and given an opportunity to comment. I understood that consistent with that practice, which is intended to promote accuracy and balance in our reporting, [Dohrmann] contacted or tried to contact Nelson, Howland, UCLA Athletic Director Dan Guerrero, and all or virtually all of the present or former UCLA players mentioned in the Article. I heard from [Dohrmann] that he had to work hard to obtain any comments from UCLA. [Dohrmann] told me that he communicated the content of the Article in detail to UCLA's Director of Athletic Communications and, only after repeated requests, the University provided written comments from Howland but refused to make Howland, Guerrero or any current UCLA players available to speak. The Article contains comments we received from Nelson and Howland."

### 2. Declaration of George Dohrmann

Dohrmann said that the information in the article was obtained largely from interviews of 13 former UCLA players and staff members from the past four UCLA teams, all of whom played for or worked with Howland, and most of whom knew Nelson. He also spoke to others who knew Nelson, Nelson himself, and the UCLA Director of Athletic Communications.

Dohrmann conducted "all but a few of the interviews by phone," and attached his cell phone records showing calls made from November 21, 2011, to March 21, 2012. Calls unrelated to the UCLA story and other information were redacted "for privacy

10

reasons or to protect the identity of confidential sources." Dohrmann said the phone logs show more than 150 telephone calls, totaling more than 20 hours, with third parties in connection with the article, and said he spoke to many sources multiple times. The "overwhelming majority of [Dohrmann's] sources for the Article" spoke with Dohrmann on condition of confidentiality.

Dohrmann said that each of the allegedly defamatory statements was confirmed by multiple confidential sources, and he included a list of the number (but not the identities) of his confidential sources for each statement. Dohrmann also said that he tried to contact players Tyler Honeycutt, Drew Gordon, J'mison Morgan, Malcolm Lee, Jerime Anderson, Josh Smith, and Anthony Stover; in each case, a spokesperson said the player would not comment for the article. Further, "[a]lthough it is accurate that I did not seek to speak to nine players who submitted declarations, I believed it was unnecessary or would have been futile. I did not feel it was necessary to speak to seven of the players [who submitted declarations attached to the complaint]—Larry Drew, Jr., Kenny Jones, Lazeric Jones, Tyler Lamb, Norma[n] Powell, David Wear and Travis Wear—because they did not play with Nelson during the 2009-2010 season, which is when nearly all the incidents relating to Nelson that are reported in the Article occurred. Although Tyler Trapani and Matt DeMarcus, the other two players with whom I did not seek to speak, played with Nelson during the 2009-10 season, I did not feel it was necessary to speak to them because I already had so many reliable sources for those incidents. In addition, I did not seek to speak to these nine players because there is nothing negative in the Article about any of them and because I believe it would have been futile to ask UCLA for permission to speak to them given that it had declined my requests to speak to other current athletes about the Article."

Dohrmann also said that he spoke to Nelson by telephone on February 24, 2012. During that call, "I asked if I could tell him what we were writing about him, and he said I could; and I told him to speak up if something I told him was wrong, and he said he would do so. I mentioned the fights with Moser and Gordon and how players said Nelson got upset, stalked his teammates and injured a number of them, and I named the

11

players the Article asserts he injured. I also described the incident in which Nelson stepped on Trapani's chest. Nelson confirmed all those incidents and expressed his regret: 'On all of that stuff, I have no trouble admitting that I lost control of my emotions sometimes.' He also stated, 'I take responsibility for my actions. I'm really just trying to learn from the mistakes I made on all levels.' The Article includes those comments. I also described to Nelson what we were going to write about the incident involving his urinating on teammate Tyler Honeycutt's bed, and he responded, 'I would dispute that that is exactly what happened but I understand people would say that is what happened. But I think, most of all, you should know that Tyler and I are still friends.' The Article includes that comment. I also told him what we were writing about his treatment of Carlino, and he confirmed it. In addition, during the call, I described other information about him in the Article, and apart from disputing the precise characterization of the peeing incident, Nelson did not deny any of the information in the Article that I described to him. Immediately after the call with Nelson ended, I called [my editor] to let him know what had happened during the call."

Dohrmann concluded: "When the Article was published, I believed everything reported in the Article was truthful and substantiated. I did not doubt the accuracy of any statement in the Article. The Article is a truthful account of the situation at UCLA, and it notes both the team's laudatory traditions and its current difficulties. I had heavily researched the Article and reviewed all of the sources with my supervising editor. I relied on eight players and two team staff members for the descriptions of Nelson, including mostly eyewitnesses. I had multiple sources for all but one of the statements in the Article relating to Nelson, and the facts my sources provided about Nelson were consistent and corroborative with one another and with published reports of other behavior problems by Nelson. I did not observe any signs of bias against Nelson among the sources that led me to believe any source was not credible. Furthermore, Nelson confirmed the incidents I described to him from the Article, and Howland did not deny any of the incidents relating to Nelson's conduct."

12

*B.*      *Nelson's Opposition*

In opposition to the anti-SLAPP motion, Nelson urged that he was not a limited purpose public figure; he also contended that the article was false, defamatory, and published with actual malice.  In support, he submitted his own declaration in which he addressed and specifically denied each of the events described in the article.[2]  He also

---

[2]      With regard to these incidents, Nelson declared as follows:

● *Intentionally hitting Mike Moser in the chest during practice* — "This is false.  I have never fought with Mike Moser, not during practice or otherwise, nor did I commit an 'illegal screen' on him during practice, nor did we threaten to attack each other during practice or otherwise.  We have been and remain good friends."

● *Fight with Drew Gordon at a teammate's apartment* — "This is false.  I have never fought with Drew Gordon, much less given him a black eye.  Gordon has been and remains a close friend of mine since middle school."

● *Reinjuring James Keefe's surgically-repaired shoulder* — "This is false.  I never intentionally 'pulled down suddenly' on Keefe's arm during practice, re-injuring his post-surgery shoulder, nor did I ever intentionally injure him in any fashion, not during practice or otherwise.  James Keefe . . . and I remain good friends."

● *Intentionally "hacking" Alex Schrempf*, *injuring his back*, *and sidelining him for several months* — "This is false.  I never hacked at Schrempf from behind during practice, let alone assaulted him in such fashion that his back was injured for months.  Schrempf was and remained my roommate during my freshman year [at] U.C.L.A., and he was and remains a close personal friend of mine."

● *Intentionally elbowing Brendan Lane* — "This is false.  I never threw an elbow at Lane during practice, injuring Lane's ribs, nor did I attack or assault him in any fashion during practice."

● *Intentionally stomping on Tyler Trapani's chest* — "This is false.  I never went out of my way to step on Trapani's chest as described in Defendants' article.  We did get tangled up during a three-on-two practice drill.  In this drill, Trapani took a charge on me, meaning he intentionally positioned himself beneath me on the court.  As a consequence, I did have contact with him, but I did not go 'out of my way to step on Trapani's chest as he lay on the ground.'"

● *Urinating on Tyler Honeycutt's bed and clothes* — "This is false.  I never urinated on Honeycutt's or any teammate's bed, not for 'revenge' or for any reason.  I *did* play a minor college prank on Honeycutt by flipping his mattress and putting some baby powder, candy, and silly string on it.  I did *not* ruin his mattress, sheets, and clothing in the demeaning fashion described in Defendants' article.  I have known Honeycutt since I was fifteen years old.  Honeycutt and I have been and remain good friends.  I very much doubt that we would remain friends if I did what Defendants wrote I did to him."

(Fn. continued.)

13

said that he briefly spoke to Dohrmann before the article was published but did not confirm any of the events described in the article. Indeed, he said, Dohrmann "spent the bulk of our brief telephone call asking me to comment about various portions of his to-be-published article, which portions were unrelated to me and mostly focused on Coach Howland. . . . During my entire conversation with Dohrmann, he brought up *none* of the specific instances of my alleged bullying and violence against my teammates and team staff save . . . one[.]" (Nelson's declaration testimony regarding his conversation with Dohrmann is described in greater detail below.)

In opposition to the anti-SLAPP motion, Nelson also submitted the 18 declarations of his former teammates attached to his complaint. Sixteen of the players said they had not spoken with Dohrmann or anyone at Sports Illustrated about the article; the other two

---

● *Honeycutt's move to a new dorm room* — "According to Defendants' article, Honeycutt was so offended by my demeaning behavior that he reportedly requested and received his own dorm room away from me because of the New Years' Eve incident . . . . This is false. Honeycutt never requested to be in his own dorm room away from me, not because I did anything to his bed or otherwise."

● *Attacking and insulting Matt Carlino* — "This is false. I myself have had numerous concussions, so I know how tough such injuries can be. Having received concussions, I know that the team's medical staff decided when Carlino would be ready to return to active playing, as opposed to Carlino himself as implied in Defendants' article. As such, it would make no sense for me to ridicule him for missing games because of his injury. I never went 'out of my way' to set a screen on Carlino to hit him, and I never went out of my way to attack Carlino in any fashion. Based on my conversations with Carlino as well as my observations and first-hand knowledge of his playing time during games, I understood from Carlino that he transferred from U.C.L.A. because he was third on the depth chart behind teammates Lazeric Jones and Jerime Anderson. As such, Carlino left U.C.L.A. because he effectively received little or no playing time by the coaching staff during games, and he wanted more."

● *Howland's refusal to discipline Nelson* — "This is false. Besides the fact that the incidents recounted by Defendants never happened, I was repeatedly disciplined by Coach Howland for numerous reasons, which included but was not limited to my November 2011 suspension from the team and my December 2011 expulsion from the team. Through my entire time with the U.C.L.A. team, Coach Howland repeatedly disciplined me for my failure to take practice drills and team games seriously, for not going full speed at all times, and for otherwise not playing up to my skills."

14

said they told Dohrmann that specific events described in the article had not occurred.[3] Many of the players denied specific events described in the article, and each made a statement substantially like the following: "During my time at U.C.L.A., I regularly attended practice and team games with Reeves Nelson ('Nelson'). I never saw Nelson intentionally hurt or intentionally try to hurt any member of the U.C.L.A. basketball team or staff, nor do I believe that Nelson ever intentionally hurt or tried to hurt any member of the U.C.L.A. basketball team or staff, nor do I believe that Nelson 'stalked' or 'targeted' them during practice. I did not observe and do not believe that Coach Howland favored Nelson over the other players in any fashion, not with respect to discipline or anything

---

[3] Blake Arnet stated that he spoke to Dohrmann by telephone. During that conversation, "Dohrmann told me that he had heard that Nelson intentionally hurt and abused his teammates during and after practice sessions. . . . I told Dohrmann that I never saw Nelson intentionally hurt or intentionally try to hurt any member of the U.C.L.A. basketball team or staff, nor do I believe that Nelson ever intentionally hurt or tried to hurt any member of the U.C.L.A. basketball team or staff, nor do I believe that Nelson 'stalked' or 'targeted' them during practice. [¶] . . . I explained to Dohrmann that I never saw Nelson 'lose it' during practice or otherwise 'disrupt' practice, not because of foul calls or otherwise. I do not believe that Coach Howland gave Nelson 'the benefit of the doubt on foul calls in practice so [Nelson] wouldn't lose it.'"

Alex Schrempf also said he spoke to Dohrmann by telephone. During that conversation, "Dohrmann told me that he had heard that Reeves Nelson ('Nelson') intentionally hurt me during practice as part of his 'pattern' of abusive behavior toward teammates. I explained to Dohrmann that any such claims or stories were incorrect. [¶] . . . During our conversation, Dohrmann specifically told me that he had 'heard' that Nelson intentionally injured me during practice by knocking me to the ground from behind. According to Dohrmann's 'source,' Nelson's conduct caused me to suffer a serious back injury. I explained to Dohrmann that this version of events was incorrect. While I was fouled by Nelson during a practice game, I explained to Dohrmann that I did not believe Nelson intentionally meant to injure me. I further explained to Dohrmann that I hurt my hip as a result of landing on my back during this practice game. I further explained to Dohrmann that I was then and remain close friends with Nelson."

Schrempf said he also told Dohrmann that the Trapani incident described in the article had not happened. "Dohrmann talked to me about an incident between Nelson and teammate Tyler Trapani ('Trapani'). I attended the practice at which Trapani was injured. I told Dohrmann that I did not observe Nelson 'step on Trapani's chest as he lay on the ground' during team practice."

15

else. [¶] . . . I never saw Nelson 'lose it' during practice or otherwise 'disrupt' practice, not because of foul calls or otherwise. I do not believe that Coach Howland gave Nelson 'the benefit of the doubt on foul calls in practice so [Nelson] wouldn't lose it,' nor did I see or hear Nelson yell at Coach Howland if a foul was called against him during practice."

### C. Order Granting the Anti-SLAPP Motion

The court ruled that Nelson's causes of action arose from the exercise of defendants' free speech rights, and thus that the first prong of the anti-SLAPP statute was met. With regard to the second prong, Nelson's likelihood of prevailing on the merits, the court made detailed findings of fact and law. The court concluded that Nelson is a limited purpose public figure and thus must demonstrate "actual malice" to prevail. The court expressed concern that Nelson's declarations did not contain original signatures and some did not indicate the date or the place where the declarations were signed. The court nonetheless considered the contents of the declarations and concluded that Nelson failed to make the required showing:

"Plaintiff seeks to attack Dohrmann's detailed declaration via the same 18 declarations from his former teammates that he attached to his complaint, in addition to his own declaration. These declarations all dispute aspects of the article's statements relating to Nelson, going only to the issue of falsity, not malice. Dohrmann attested that he was unsuccessful in his efforts to reach Honeycutt, Gordon, Morgan, and Lee—all former UCLA players—for comments while researching the article. He was unable to contact Anderson, Smith, and Stover, then current UCLA players.

". . . He contacted and attempted to speak with the coach, Howland. He contacted the team['s] . . . media outlet. And he has a hundred minutes of conversations, ten telephone conversations with the UCLA director, athlete communications. He has extensive telephone records indicating the time he spent almost exclusively [in] January, February 2012. He has 11 sources, eight of [whom] are former teammates.

16

". . . The Dohrmann declaration shows that he did not feel it was necessary to speak to seven of the players . . . because they did not play with Nelson during the 2009-2010 season, which is when nearly all the incidents relating to Nelson that are reported in the article occurred. [¶] . . .

"And there's an Excel spreadsheet embedded in the moving papers that shows the number of confidential sources for each subject . . . and some of the subjects have 11 sources . . . . The lowest one was two on the injury of Alex Schrempf. And the cell phone records or the telephone records show that this man spent a lot of time and talked to a lot of people about this in preparation for this article.

"As defendants state, of 19 declarants only three—Nelson, Schrempf, and Arnet— have any relevance to the issue of actual malice. They are the only declarants who spoke with Dohrmann before the article was published. The Schrempf and Arnet declarations contain only immaterial discrepancies and do not show actual malice.

"Schrempf claims that he told Dohrmann that he was fouled by the plaintiff during the practice game, and he hurt his hip, not his back. And he also contends that he explained to Dohrmann that he did not believe plaintiff intentionally meant to injure him. Schrempf does not dispute that plaintiff's conduct injured him. Whether the injury involved his back or hip is not consequential for the purpose of this analysis.

"Dohrmann advised he had two sources for the description of the Schrempf incident in the article. . . .

"Also, Schrempf's statement regarding the plaintiff's intent may be disregarded. A declaration of one's own intent is admissible as a statement of fact where relevant, but a declaration as to someone else's intent is a mere opinion or conclusion.

"Schrempf further claims that he told Dohrmann that he did not observe the plaintiff step on Trapani's chest as he lay on the ground during team practices. Dohrmann, however, has advised that he had three sources for the description of the Trapani incident . . . .

". . . Trapani in his declaration submitted with plaintiff's opposition, states that he did take a charge from the plaintiff during what we call a three-on-two, two-on-one drill.

17

The only dispute here, then, is whether or not plaintiff intentionally stepped on Trapani. Again, a statement as to someone else's intent is a mere opinion or conclusion.

"Schrempf's dispute about how the James Keefe incident was characterized also boils down to an opinion regarding whether or not the plaintiff acted intentionally. Dohrmann has advised that he had four sources for the description of this incident.

". . . Arnet's dispute of how the Trapani incident was characterized again constitutes nothing more than his opinion regarding whether or not the plaintiff acted intentionally. His claim that he explained to Dohrmann that he never saw plaintiff lose it during practice or otherwise disrupt the practice is also his opinion. Defendant Dohrmann has advised that he had numerous sources confirming same. [¶] . . . [¶]

"Plaintiff's own declaration does not establish actual malice. After the article sets forth certain allegedly defamatory statements of plaintiff's aggressive conduct towards his teammate[s], it states plaintiff confirmed all of these incidents to Sports Illustrated and . . . expressed his regret, saying, 'On all that stuff, I have no trouble admitting that I lost control of my emotions sometimes. I take responsibility for my actions. I'm really just trying to learn from the mistakes I made on all levels.' [¶] . . . [¶]

"Plaintiff's version of his conversation with Dohrmann is contradicted by Dohrmann. However, even plaintiff's version, if accepted, does not constitute actual malice as to the allegedly defamatory statement. Plaintiff admitted making the statement. There's no issue of a quotation being deliberately altered. As defendant points out, although plaintiff claims the meaning of these quotations was distorted, he cites no authority for the proposition that a dispute over the meaning of the quotation is sufficient to show actual malice where the quotation was not altered.

"Even if it could be assumed that the defendants misquoted . . . plaintiff's confirmation of certain incidents, that would not establish that defendants knowingly misstated the incidents themselves." (Citation and internal record references omitted.)

The court granted the anti-SLAPP motion on October 16, 2012, and defendants served notice of entry of the order on October 19, 2012. Nelson timely appealed.

18

## I.     The Anti-SLAPP Law

"The anti-SLAPP law provides that '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.' (§ 425.16, subd. (b)(1).)  The purpose of the statute is to encourage participation in matters of public significance by allowing a court to promptly dismiss unmeritorious actions or claims brought to chill another's valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.  (§ 425.16, subd. (a).)

"The anti-SLAPP law involves a two-step process for determining whether a claim is subject to being stricken.  In the first step, the defendant bringing an anti-SLAPP motion must make a prima facie showing that the plaintiff's suit is subject to section 425.16 by showing the defendant's challenged acts were taken in furtherance of his or her constitutional rights of petition or free speech in connection with a public issue, as defined by the statute.  (*Jarrow Formulas*, *Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733.)

"After the defendant satisfies the first step, the burden shifts to the plaintiff to demonstrate there is a reasonable probability he or she will prevail on the merits at trial.  (§ 425.16, subd. (b)(1).)  In this phase, the plaintiff must show both that the claim is legally sufficient and there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment.  (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823, disapproved on other grounds in *Equilon Enterprises v. Consumer Cause*, *Inc*. [(2002)] 29 Cal.4th [53,] 68, fn. 5; *Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 358.)  In making this assessment, the court must consider both the legal sufficiency of and evidentiary support for the pleaded claims, and must also examine whether there are any constitutional or nonconstitutional defenses to the pleaded claims and, if so, whether

there is evidence to negate any such defenses. (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398-399.)

"In considering whether a plaintiff has met those evidentiary burdens, the court must consider the pleadings and the evidence submitted by the parties. (§ 425.16, subd. (b)(1), (2).) However, the court cannot weigh the evidence (*Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 537-538) but instead must simply determine whether the plaintiff's evidence would, if credited, be sufficient to meet the burden of proof. (*Wilcox v. Superior Court*, *supra*, 27 Cal.App.4th at pp. 823-825 [standard for assessing evidence is analogous to standard applicable to motions for nonsuit or directed verdict].)

"On appeal, we review de novo the trial court's ruling on the motion to strike. (*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 339.)" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 107-109 (*McGarry*).)

Nelson concedes that all three causes of action asserted in the operative complaint implicate defendants' free speech rights and, thus, defendants have satisfied their burden under the first prong of the anti-SLAPP analysis. The only issue on appeal, therefore, is the second prong: whether Nelson introduced sufficient evidence to establish a probability of success on the merits of his defamation and related claims.

## II.      Evidentiary Issues

We begin by addressing defendants' evidentiary challenge to Nelson's declarations. Defendants assert that all of Nelson's declarations had evidentiary defects—namely, the declarations "lacked original signatures and numerous declarations failed to meet the requirements of Code of Civil Procedure section 2015.5." Thus, defendants say, Nelson has "failed to offer any admissible evidence for this Court to consider on appeal and the trial court's decision should be affirmed on that . . . basis." For the reasons that follow, we reject defendants' evidentiary challenges and consider the substance of Nelson's declarations.

20

Defendants did not object to the admissibility of any of Nelson's declarations. At the hearing on the anti-SLAPP motion, however, the court said that, in its view, Nelson's declarations had "major problems," noting that none of Nelson's declarations had original signatures, none specified the place of execution, and several were undated. The court nonetheless considered the content of the declarations for purposes of its tentative ruling, which it later adopted as a final ruling, stating as follows: "That tentative ruling just assumed all of these declarations were admissible. I think there are some fatal problems with them, but in an abundance of caution I included all of the declarations in the tentative ruling."

Defendants contend that we may not consider Nelson's declarations because the trial court's order excluding them was not an abuse of discretion. We do not agree. As an initial matter, we reject as a factual matter defendants' premise that the court excluded the declarations. Although the trial court expressed concern about the admissibility of the declarations, it did not exclude them; to the contrary, the court's oral ruling is clear that the court considered the declarations' contents and concluded that they did not demonstrate a likelihood that Nelson would prevail.[4]

In any event, the issue is waived. In the anti-SLAPP context, a defendant who fails to object to plaintiff's evidence in the trial court waives any objection on appeal. (E.g., *U.S. Western Falun Dafa Assn. v. Chinese Chamber of Commerce* (2008) 163 Cal.App.4th 590, 603, fn. 5 ["In the anti-SLAPP context, evidentiary objections are waived when counsel does not seek or obtain rulings on its evidentiary objections at the hearing."].) This is so to give the plaintiff an opportunity to cure correctable evidentiary defects. In *Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1269, the court explained the rule as follows: "We do not quarrel with the proposition the Legislature intended '"to prevent SLAPPs by ending them early and without great cost to the SLAPP target."' But

---

[4] Defendants appear to concede this point early in their respondents' brief, saying, "The court fully credited the numerous declarations filed by Nelson and did not weigh the credibility of the evidence."

21

the Legislature also intended 'to avoid jeopardizing meritorious lawsuits.'  Requiring the defendant to clearly state the specific ground of her objection to the plaintiff's evidence maintains this balance between the interests of the defendant and the plaintiff."  In the case before it, the *Gallagher* court said, had the defendant objected to the evidence as hearsay when offered by plaintiff in opposition to the anti-SLAPP motion, plaintiff "would have had the opportunity to cure the defect in his evidence.  He could have obtained a declaration from the reporter or another witness testifying [defendant] made the statement.  Alternatively he could have asked the trial court to continue the hearing on the motion and lift the stay on discovery so he could take the reporter's deposition. . . . We also observe it is entirely possible if not probable [plaintiff] will introduce the reporter's testimony at trial, or at least other evidence proving [defendant] indeed did make these statements during her interview for the newspaper article.  *In other words, this is not the sort of evidentiary problem a plaintiff will be incapable of curing by the time of trial*."  (*Ibid*., italics added, fns. omitted.)

The present case is analogous.  Had defendants objected to Nelson's declarations on the grounds that they did not comply with section 2015.5, Nelson likely could have cured the asserted defects by filing original signatures and, where necessary, having witnesses sign new declarations that indicated the dates on which they were signed. Because defendants did not object, Nelson never had the opportunity to which he was entitled to cure evidentiary defects.  Accordingly, the court was not precluded from considering Nelson's declarations.[5]

---

[5]    In any event, the case on which defendants rely for the proposition that the trial court had discretion to exclude the declarations, *Kulshrestha v. First Union Commercial Corp*. (2004) 33 Cal.4th 601, does not support it.  In *Kulshrestha*, the Supreme Court considered whether declarations "signed under penalty of perjury outside this state satisfy section 2015.5, and are admissible in summary judgment and other authorized proceedings, even though the contents are not certified as true 'under the laws of the State of California.'"  (*Id*. at p. 606.)  The court answered the narrow question before it in the negative:  "[Section 2015.5] requires some acknowledgement on the face of the declaration that perjured statements might trigger prosecution *under California law*.  The

(Fn. continued.)

## III. Defamation

Nelson's first cause of action is for defamation. "The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.)" (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369.) A public figure (or "limited purpose public figure") suing for defamation must also demonstrate "actual malice." (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 84 (*Christian Research*).)

A statement is defamatory if it exposes the plaintiff "'to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.' (Civ. Code, § 45.)" (*McGarry*, *supra*, 154 Cal.App.4th at p. 112.) "A statement is defamatory when it tends 'directly to injure [a person] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits.' (Civ. Code, § 46, subd. 3.) Statements that contain such a charge directly, and without the need for explanatory matter, are libelous per se. (Civ. Code, § 45a.)" (*Ibid.*)

---

Legislature has determined that such knowledge can be inferred from the 'place of execution' where the document shows it was signed here. (§ 2015.5.) All other declarations, including those signed in other states, must invoke 'the laws of the State of California.' (*Ibid.*)" (*Id.* at p. 606.) Because the *Kulshrestha* plaintiff's declaration was executed in Ohio and did not declare that it was made "'under the laws of the State of California,'" the trial court correctly sustained defendant's objection to it. (*Id.* at p. 607.) The present case is distinguishable, however. Although several of the players' declarations do not indicate where they were signed, each player declared "*under penalty of perjury under the laws of the State of California*" that his statement was true and correct. (Italics added.) Because the declarations thus expressly reference California's perjury laws, they were not required to also state the place of execution. (Code Civ. Proc., § 2015.5.)

There can be no doubt that the article exposes Nelson to "hatred, contempt, ridicule, or obloquy," would cause him to be "shunned or avoided," and has a tendency to injure Nelson in his occupation. Further, Nelson contends, and defendants do not contest, that the opposition to the anti-SLAPP motion established a prima facie case of falsity.[6] We therefore consider whether (1) Nelson is a public figure (or a "limited purpose public figure"), and (2) whether Nelson has made a prima facie showing that defendants acted with actual malice.

### A.      *Nelson Is a Limited Purpose Public Figure*

To determine whether Nelson must establish malice, we must first decide whether Nelson is a "public figure" (or a "limited purpose public figure"). Nelson asserts he is not a public figure because he had not "'undertaken some voluntary act through which he seeks to influence the resolution of the public issues involved'" and did not have an "'influential role in ordering society.'" Instead, Nelson urges, he is a "twenty-year-old, unemployed, *former* college basketball player" who "was then and remains now a 'private individual.'" Defendants disagree, contending that because Nelson received national attention as a top college basketball player for a high profile team, he is, at a minimum, a limited purpose public figure. For the reasons that follow, defendants are correct.

In *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 278-280 (*New York Times*), the United States Supreme Court held that the First Amendment requires plaintiffs who are public officials to prove "actual malice" to recover damages in defamation actions. Ten years later, in *Gertz v. Robert Welch* (1974) 418 U.S. 323, 342 (*Gertz*), the court extended the actual malice requirement to plaintiffs who, although they are not public officials, "by reason of the notoriety of their achievements or the vigor and

---

[6]      Although defendants assert in their respondents' brief that they "never conceded that the statements in the Article were false," they do not contend that plaintiff did not establish a prima facie case of falsity.

24

success with which they seek the public's attention, are properly classified as *public figures*." (Italics added.) The court explained its extension of the actual malice requirement to public figures as follows: "Those classed as public figures stand in a similar position [to public officials]. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." (*Id*. at p. 345.)

Courts have frequently applied the *New York Times/Gertz* standard to conclude that professional and college athletes and coaches are "public figures" subject to the actual malice standard. *Time*, *Inc. v. Johnston* (4th Cir. 1971) 448 F.2d 378 (*Johnston*) is one such case. There, the plaintiff, a former professional basketball player and college basketball coach, brought a libel action after Sports Illustrated reported plaintiff had been "destroyed . . . psychologically" and "practically [run] out of organized basketball." (*Id*. at p. 379.) The Fourth Circuit Court of Appeals reversed an order denying summary judgment for defendant, concluding in relevant part that plaintiff was a limited purpose public figure. It explained:

"There can be no dispute that at the time of the events discussed in the challenged publication the plaintiff met the criteria of 'a public figure.' 'Public figures,' within the contemplation of the rule in *New York Times* [*Co. v. Sullivan*, *supra*, 376 U.S. 254], as enlarged by subsequent cases, are 'those persons who, though not public officials, are "involved in issues in which the public has a justified and important interest"' and 'include artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done.' *Cepeda v. Cowles Magazines and Broadcasting*, *Inc*. (9th Cir. 1968) 392 F.2d 417, 419, cert. denied 393 U.S. 840.

25

Consonant with this definition, a college athletic director,[7] a basketball coach,[8] a professional boxer[9] and a professional baseball player,[10] among others, have all been held to be 'public figures.' The plaintiff, as he figures in the challenged publication, fits this definition of a 'public figure.' . . . He had offered his services to the public as a paid performer and had thereby invited comments on his performance as such. In a sense, he assumed the risk of publicity, good or bad, as the case might be, so far as it concerned his public performance. The publication in question related strictly to his public character. It made no reference to his private life, it involved no intrusion into his private affairs. It dealt entirely with his performance as a professional basketball player; it discussed him in connection with a public event in which the plaintiff as a compensated public figure had taken part voluntarily." (*Johnston*, *supra*, 448 F.2d at p. 380.)

---

[7] *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130 [college athletic director and former college head football coach must prove actual malice to prevail against the Associated Press in a libel action arising out of article accusing athletic director of conspiring to "fix" a college football game].

[8] *Grayson v. Curtis Publishing Co.* (1967) 72 Wash.2d 999, 1007 [college basketball coach was a "public figure in which the public has a justified and important interest"; thus, he was required to establish actual malice in defamation action].

[9] *Cohen v. Marx* (1949) 94 Cal.App.2d 704, 705 [professional boxer waived his right to privacy: "A person who by his accomplishments, fame, or mode of life, or by adopting a profession or calling which gives the public a legitimate interest in his doings, affairs, or character, is said to become a public personage, and thereby relinquishes a part of his right of privacy. [Citations.] [¶] Applying the foregoing rule to the facts in the present case it is evident that when plaintiff sought publicity and the adulation of the public, he relinquished his right to privacy on matters pertaining to his professional activity, and he could not at his will and whim draw himself like a snail into his shell and hold others liable for commenting upon the acts which had taken place when he had voluntarily exposed himself to the public eye. As to such acts he had waived his right of privacy and he could not at some subsequent period rescind his waiver."].

[10] *Cepeda v. Cowles Magazines & Broadcasting*, *Inc.*, *supra*, 392 F.2d at pages 418-421 [professional baseball player was a public figure and, thus, was required to prove actual malice in libel action against national magazine].

The court reached a similar result in *Chuy v. Philadelphia Eagles Football Club* (E.D.Pa. 1977) 431 F.Supp. 254 (*Chuy*), concluding that a professional football player suing for defamation was a public figure. It explained that under Supreme Court case law, a public figure is one who has "voluntarily placed himself before the public eye." (*Id*. at p. 266.) A public figure need not be involved in an issue of public *controversy*, the court said—it is enough that the society's interest "inspires comment in the press and elsewhere." (*Id*. at p. 267.) It explained: "Where a person has . . . chosen to engage in a profession which draws him regularly into regional and national view and leads to 'fame and notoriety in the community,' even if he has no ideological thesis to promulgate, he invites general public discussion. We obviously cannot say that the public's interest in professional football is important to the commonweal or to the operation of a democratic society in the same sense as are political and ideological matters. However, the fabric of our society is rich and variegated. As is demonstrated by the Nielsen ratings, the American public is fascinated by professional sports. In view of that fact we must affirm the proposition that interest in professional football must be deemed an important incident among many incidents, of a society founded upon a high regard for free expression.

"We consider it unacceptable for a court in determining whether a particular individual is a 'public figure' to pass qualitatively upon the 'affairs of society.' If society chooses to direct massive public attention to a particular sphere of activity, those who enter that sphere inviting such attention must overcome the *Times* standard. Society's interest inspires comment in the press and elsewhere. The greater the interest, the greater is the public's self-generating need for the facts. This is especially so in this case where the subject matter pertained to Donald Chuy's ability to continue playing professional football, a matter in which the sports loving public had a not insignificant interest." (*Chuy*, *supra*, 431 F.Supp. at p. 267, fn. omitted.)

The Court of Appeal relied on *Johnston* and *Chuy* to conclude in *McGarry*, *supra*, 154 Cal.App.4th 97, that a former university head football coach was a limited purpose public figure for First Amendment purposes. It explained: "Numerous courts, beginning

27

with the Supreme Court's opinion in *Curtis Publishing Co. v. Butts*[, *supra*,] 388 U.S. 130, have concluded professional and collegiate athletes and coaches are at least limited purpose public figures.  (See e.g., *Brewer v. Memphis Pub. Co.*, *Inc*. (5th Cir. 1980) 626 F.2d 1238, 1254-1255; *Chuy v. Philadelphia Eagles Football Club*[, *supra*,] 431 F.Supp. 254, 267.)  '[A] common thread in these cases is that one's voluntary decision to pursue a career in sports, whether as an athlete or a coach, "invites attention and comment" regarding his job performance and thus constitutes an assumption of the risk of negative publicity.'  (*Barry v. Time*, *Inc*. (N.D.Cal. 1984) 584 F.Supp. 1110, 1119.)  . . .  [¶] McGarry voluntarily entered the public arena as a college football coach, and the statements dealt exclusively with his performance of the public role he voluntarily undertook.  We conclude McGarry was a limited purpose public figure for purposes of the allegedly defamatory statements." (*McGarry*, *supra*, 154 Cal.App.4th at p. 115.)

The present case is analogous to those discussed above.  Nelson was an important part of the UCLA men's basketball team.  He was named in more than 2,000 news articles that predate the article's publication and, while at UCLA, regularly gave interviews and appeared in post-game news conferences.  His picture appeared on the cover of the November 14, 2011 Western Regional issue of Sports Illustrated as one of the country's top college basketball players.  Further, by his own admission, Nelson "rapidly earn[ed] a reputation for himself as one of the team's (and college basketball's) rising stars.  During his freshman year, Nelson was named to the Pacific-10 Conference's All-Freshman Team.  He also earned U.C.L.A.'s Seymour Armond Memorial Award/Most Valuable Freshman along with teammate and future N.B.A. player Tyler Honeycutt.  During his sophomore year, Nelson was twice named the Pacific-10 Conference Player of the Week and repeatedly led his team in scoring, rebounding, and field goal percentage.  Following the 2010-2011 season, Nelson was named to the All Pacific-12 Conference Men's First Basketball Team, the U.S. Basketball Writers' Association District IX Team, and the National Association of Basketball Coaches All-District 20 Second Team.  He also received U.C.L.A.'s Gerald A. Finerman Award as Team Rebounding Leader and the Coach John Wooden Award/Tri-Most Valuable

Player, which latter honor he shared with teammates Tyler Honeycutt and Malcolm Lee."[11]

Given the exceedingly widespread interest in UCLA men's basketball and Nelson's position as a "rising star" on that team, we necessarily conclude that, like the professional athletes and coaches at issue in *Johnston*, *Chuy*, and *McGarry*, Nelson is a limited purpose public figure. As in those cases, Nelson has voluntarily chosen to pursue a career in sports, inviting "comment and attention" about his job performance. Moreover, the article related solely to his "public character" as a basketball player, discussing him solely in connection with public events in which Nelson took part voluntarily.

Nelson cites *Wilson v. Daily Gazette Co.* (2003) 214 W.Va. 208 (*Wilson*) for the proposition that an *amateur* sports figure, as distinct from a *professional* athlete, is not a limited purpose public figure. We do not agree. The *Wilson* plaintiff was a 17-year-old high school athlete who was a member of his high school's football and basketball teams and received a scholarship to play football at West Virginia University. (*Id*. at p. 211.) The defendant newspaper published two articles referencing a rumor that plaintiff had exposed himself during a basketball game, and plaintiff sued for defamation. (*Id*. at p. 213.) The West Virginia Supreme Court held that plaintiff was not a public figure and therefore need not prove actual malice because defendant's evidence "simply established that in some circles, namely athletics, Mr. Wilson may have achieved a reputation as a quality high school athlete." (*Id*. at pp. 216-217.) Such evidence, the court said, "does not satisfy the high bar outlined by *Gertz*." (*Id*. at p. 217.)

*Wilson* is not dispositive of the present case. Contrary to Nelson's contention, *Wilson's* amateur status was not relevant to the court's analysis—what mattered was the

_____

[11]     The trial court took judicial notice of the fact that "[a] search on Lexis Nexis in the 'News and Business' database, selecting 'News, all' as a source, inputting as a query 'reeves nelson and not (lawsuit or litigation or sports illustrated),' and restricting the results to those dated from January 1, 2004 to February 28, 2012, returns 2,223 articles."

29

quantum of public interest.[12]  As to that issue, there can be no real dispute that public interest in a star UCLA basketball player is considerably greater than in a small town high school athlete, whatever his talents.

Finally, the fact that Nelson is no longer playing college basketball is irrelevant. According to Nelson, "[E]ven if this Court believes that Nelson *previously was* a 'limited public figure' by virtue of his place on the U.C.L.A. Men's Basketball Team through December 2011, that ended following his dismissal from the team."  Not so.  As one court has explained:  "[M]ere passage of time will not necessarily insulate from the application of *New York Times Co. v. Sullivan*, publications relating to the past public conduct of a then 'public figure.'  No rule of repose exists to inhibit speech relating to the public career of a public figure so long as newsworthiness and public interest attach to events in such public career. . . .  [¶]  '. . . it is evident that when plaintiff sought publicity and the adulation of the public, he relinquished his right to privacy on matters pertaining to his professional activity, and he could not at his will and whim draw himself like a snail into his shell and hold others liable for commenting upon the acts which had taken place when he had voluntarily exposed himself to the public eye.  As to such acts he had waived his right of privacy and he could not at some subsequent period rescind his waiver.'"  (*Johnston*, *supra*, 448 F.2d at pp. 381-382.)

For all of these reasons, the trial court correctly concluded that to successfully oppose defendants' anti-SLAPP motion, Nelson must establish a prima facie case of actual malice.  We therefore turn to that issue.

---

[12]      Indeed, the *Wilson* court discussed *Holt v. Cox Enterprises* (N.D.Ga. 1984) 590 F.Supp. 408, in which a college football player was held to be a public figure, and agreed that the evidence before the *Holt* court supported its finding that the plaintiff was a limited purpose public figure.  (*Wilson*, *supra*, 214 W.Va. at p. 218.)

B.      *Nelson Successfully Demonstrated a Prima Facie Case of Actual Malice*

1.      Actual Malice

"A public figure suing for defamation 'must demonstrate "actual malice" by clear and convincing evidence.' (*Christian Research Institute v. Alnor*[, *supra*,] 148 Cal.App.4th 71, 84 (*Christian Research*).)  Actual malice 'requires a showing that the allegedly false statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." [Citation.]  The reckless disregard standard requires a "high degree of awareness of . . . probable falsity . . . ." [Citation.]' (*Annette F. v. Sharon S*. (2004) 119 Cal.App.4th 1146, 1167 (*Annette F.*).)  'The question is not "'whether a reasonably prudent [person] would have published, or would have investigated before publishing.  There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.  Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.'" [*Citation*.]' (*Christian Research*, *supra*, 148 Cal.App.4th at p. 84.)"[13] (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 389 (*Burrill*).)

Because Nelson will have to prove actual malice by clear and convincing evidence at trial, to successfully defend against defendants' anti-SLAPP motion, he must "'establish a probability that [he] will be able to produce clear and convincing evidence of actual malice.' (*Annette F.*, *supra*, 119 Cal.App.4th at p. 1167.)  Stated differently, we must determine whether [plaintiff] has made a sufficient prima facie showing of facts to sustain [his] burden of demonstrating a high probability that [defendants] published the defamatory statements with knowledge of their falsity or while entertaining serious doubts as to their truth.  (See *Colt v. Freedom Communications*, *Inc*. (2003) 109 Cal.App.4th 1551, 1557; *Annette F.*, *supra*, 119 Cal.App.4th at p. 1169 [defamation

---

[13]      "Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will. [Citation.]" (*Masson v. New Yorker Magazine*, *Inc*. (1991) 501 U.S. 496, 510-511 (*Masson*).)  Instead, "actual malice" is a "shorthand to describe the First Amendment protections for speech injurious to reputation." (*Id*. at p. 511.)

plaintiff bears 'the burden of making a "sufficient prima facie showing of facts to sustain a favorable judgment" on the issue of actual malice'].)" (*Burrill*, *supra*, 217 Cal.App.4th at p. 390.)

"A defamation plaintiff may rely on inferences drawn from circumstantial evidence to show actual malice. (*Reader's Digest* [*Assn. v. Superior Court* (1984)] 37 Cal.3d [244,] 257-258.) 'A failure to investigate [fn. omitted] [citation], anger and hostility toward the plaintiff [citation], reliance upon sources known to be unreliable [citations], or known to be biased against the plaintiff [citations]—such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.' (*Id*. at p. 258.) Thus, malice may be inferred where, for example, 'a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call.' (*St. Amant v. Thompson* (1968) 390 U.S. 727, 732 (*St. Amant*).) Similarly, an inference of malice may be drawn 'when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation[,] . . . [or] where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [Fn. omitted.]' (*Ibid*.) Conversely, '[t]he failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy. [Citations.] Similarly, mere proof of ill will on the part of the publisher may likewise be insufficient. [Citation.]' (*Reader's Digest*, *supra*, 37 Cal.3d at p. 258.)" (*Christian Research*, *supra*, 148 Cal.App.4th at pp. 84-85.)

### 2. Nelson's Alleged Admissions and Apology

Nelson asserts that the article contained two different kinds of defamatory statements: (1) false descriptions of his alleged aggressive conduct; and (2) false attributions *to Nelson himself* of statements admitting and apologizing for such conduct. With regard to the latter, the article states that when interviewed by Dohrmann, Nelson admitted engaging in some of the incidents of misconduct described and failed to deny others. Nelson said in his declaration, however, that he did not tell Dohrmann that he

32

engaged in *any* of the misconduct described in the article and, indeed, Dohrmann never discussed most of the alleged incidents with him.

The standard for evaluating defamation claims of this kind was set out by the United States Supreme Court in *Masson*, *supra*, 501 U.S. 496, to which we now turn.

(a)     *Masson v. New Yorker Magazine*

*Masson* involved an appeal from a summary judgment entered against a libel plaintiff who claimed he was defamed by an author who, with full knowledge of the inaccuracy, used quotation marks to attribute to plaintiff comments he had not made. (*Masson*, *supra*, 501 U.S. at p. 499.)  The defendants were author Janet Malcolm and The New Yorker, a weekly magazine.  Malcolm contacted plaintiff Jeffrey Masson, a psychoanalyst, and asked to interview him for an article regarding his relationship with the Sigmund Freud Archives.  Masson agreed and participated in a series of taped interviews.  Those interviews resulted in a lengthy article in The New Yorker that portrayed Masson in an extremely unflattering light.  (*Id.* at pp. 499-501.)

The article was made up, in large part, of lengthy passages in quotation marks that purported to represent the statements of Masson and others.  (*Masson*, *supra*, 501 U.S. at p. 500.)  Masson asserted that Malcolm fabricated or changed the meaning of many of the supposed quotations, rendering them defamatory.  (*Id.* at pp. 501-502.)  As relevant here, Malcolm quoted Masson as giving the following explanation of an attempt by Kurt Eissler, head of the Sigmund Freud Archives, to extract a promise of confidentiality from him:

""""[Eissler] was always putting moral pressure on me.  'Do you want to poison Anna Freud's last days?  Have you no heart?  You're going to kill the poor old woman.'  I said to him, 'What have I done?  You're doing it.  You're firing me.  What am I supposed to do—be grateful to you?'  'You could be silent about it.  You could swallow it.  I know it is painful for you.  But you could just live with it in silence.'  'Why should I do that?'  'Because it is the honorable thing to do.'  *Well*, *he had the wrong man*.""""

33

(*Masson*, *supra*, 501 U.S. at p. 507, internal record reference and original emphasis omitted, italics added.)

The tape recordings of the interview demonstrated that Malcolm had deleted part of what Masson said immediately before the "wrong man" sentence.  In the tape recording, Masson said as follows:  "'But it was wrong of Eissler to do that, you know. He was constantly putting various kinds of moral pressure on me and, "Do you want to poison Anna Freud's last days?  Have you no heart?"  He called me:  "Have you no heart?  You're going to kill the poor old woman.  Have you no heart?  Think of what she's done for you and you are now willing to do this to her."  I said, "What have I, what have I done?  You did it.  You fired me.  What am I supposed to do:  thank you?  be grateful to you?"  He said, "Well you could never talk about it.  You could be silent about it.  You could swallow it.  I know it's painful for you but just live with it in silence." "Fuck you," I said, "Why should I do that?  Why?  You know, why should one do that?" "Because it's the honorable thing to do and you will save face.  And who knows?  If you never speak about it and you quietly and humbly accept our judgment, who knows that in a few years if we don't bring you back?"  *Well*, *he had the wrong man*.'"  (*Masson*, *supra*, 501 U.S. at pp. 507-508, original italics omitted and italics added.)

The Supreme Court held that this alteration and others supported Masson's libel action, and thus the district court erred in granting defendants' motion for summary judgment.  (*Masson*, *supra*, 501 U.S. at p. 510.)  The court began by explaining that "[f]alse attribution of statements to a person may constitute libel, if the falsity exposes that person to an injury comprehended by the statute.  [Citations.]"  (*Ibid*.)  Indeed, "[a] self-condemnatory quotation may carry more force than criticism by another.  It is against self-interest to admit one's own criminal liability, arrogance, or lack of integrity, and so all the more easy to credit when it happens.  This principle underlies the elemental rule of evidence which permits the introduction of statements against interest, despite their hearsay character, because we assume 'that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true.'  [Citations.]" (*Id*. at p. 512.)

34

However, the court said, not every alteration to a quoted statement creates a "falsity" for purposes of defamation: "The constitutional question we must consider here is whether, in the framework of a summary judgment motion, the evidence suffices to show that respondents acted with the requisite knowledge of falsity or reckless disregard as to truth or falsity. This inquiry in turn requires us to consider the concept of falsity; for we cannot discuss the standards for knowledge or reckless disregard without some understanding of the acts required for liability. We must consider whether the requisite falsity inheres in the attribution of words to the petitioner which he did not speak." (*Masson*, *supra*, 501 U.S. at p. 513.)

The court rejected Masson's contention that any alteration beyond correction of grammar or syntax by itself proves falsity in the sense relevant to determining actual malice. It explained: "California law permits the defense of substantial truth and would absolve a defendant even if she cannot 'justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details.' . . . Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' [Citations.] Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' [Citations.]" (*Masson*, *supra*, 501 U.S. at pp. 516-517.) The court thus concluded that "a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of *New York Times Co. v. Sullivan*, 376 U.S., at 279-280, and *Gertz v. Robert Welch*, *Inc.*, *supra*, 418 U.S., at 342, unless the alteration results in a *material change* in the meaning conveyed by the statement." (*Id.* at p. 517, italics added.)

The court continued: "The use of quotations to attribute words not in fact spoken bears in a most important way on that inquiry, but it is not dispositive in every case. [¶] . . . [F]or the reasons we have given, quotations may be a devastating instrument for conveying false meaning. In the case under consideration, readers of In the Freud Archives may have found Malcolm's portrait of petitioner especially damning because so much of it appeared to be a self-portrait, told by [Masson] in his own words. And if the

35

alterations of [Masson's] words gave a different meaning to the statements, bearing upon their defamatory character, then the device of quotations might well be critical in finding the words actionable." (*Masson*, *supra*, 501 U.S. at pp. 517-518.)

With respect to the "wrong man" quotation, the court concluded that the difference between Masson's actual statement and the way in which it was quoted in Malcolm's article could support a cause of action for defamation. It explained: "The quoted version makes it appear as if [Masson] rejected a plea to remain in stoic silence and do 'the honorable thing.' The tape-recorded version indicates that [Masson] rejected a plea supported by far more varied motives: Eissler told [Masson] that not only would silence be 'the honorable thing,' but [Masson] would 'save face,' and might be rewarded for that silence with eventual reinstatement. [Masson] described himself as willing to undergo a scandal in order to shine the light of publicity upon the actions of the Freud Archives, while Malcolm would have [Masson] describe himself as a person who was 'the wrong man' to do 'the honorable thing.'" (*Masson*, *supra*, 501 U.S. at p. 525.) This difference, the court said, "is material, a jury might find it defamatory, and, for the reasons we have given, there is evidence to support a finding of deliberate or reckless falsification." (*Ibid*.)

>       (b)     <u>If credited by a trier of fact, Nelson's declaration testimony that defendants altered or fabricated his alleged admissions and apology would support a defamation judgment</u>

The article contains three statements that purport to quote or paraphrase Nelson's statements to Dohrmann. Nelson contends that the first misrepresents the nature of Dohrmann's disclosures to Nelson, rendering Nelson's response to Dohrmann misleading; he says the others are fabricated.

*Nelson's confirmation of incidents and expression of regret*. The article says that Nelson confirmed the incidents described and expressed regret for them, as follows:

36

"Nelson confirmed all these incidents to [Sports Illustrated] and expressed his regret, saying, 'On all that stuff, I have no trouble admitting that I lost control of my emotions sometimes. I take responsibility for my actions. I'm really just trying to learn from the mistakes I made on all levels.'"

Nelson says that although he made the statement the article attributes to him, he was not referring to the misconduct described in the article. He says: "According to the article, I confirmed each of my reported acts of violence and bullying against my teammates to Defendants . . . . This is false.

". . . After Dohrmann telephoned my home and left his number with my father, I called Dohrmann back. We then had a brief telephone conversation. At the very start of our call, Dohrmann asked me how I felt about my November 2011 suspension from the team and my December 2011 expulsion from the team. I then told him something to the effect of the words quoted above—'On all that stuff, I have no trouble admitting that I lost control of my emotions sometimes. I take responsibility for my actions. I'm really just trying to learn from the mistakes I made on all levels.' [¶] . . . [¶] Dohrmann then spent the bulk of our brief telephone call asking me to comment about various portions of his to-be-published article, which portions were unrelated to me and mostly focused on Coach Howland. I declined to comment about these portions of his article. During my entire conversation with Dohrmann, he brought up *none* of the specific instances of my alleged bullying and violence against my teammates and team staff save for one—the Honeycutt incident—which he brought up at the very end of our telephone call. . . .

". . . Dohrmann never referenced or asked me about the bulk of his article's statements about me during our telephone call. He did not reference or ask me about my alleged bullying and violence toward Mike Moser, James Keefe, Drew Gordon, Tyler Trapani, Brendan Lane, Alex Schrempf, or Matt Carlino. He did not reference or ask me about Coach Howland allegedly withholding punishment from me because of my alleged violence and bullying toward these or other players. . . . He brought up none of these things during our conversation, most of which conversation revolved around the remainder of his article attacking Coach Howland and other players on the team. As

37

such, I *never confirmed or even spoke to Defendants* about the overwhelming majority of incidents of my alleged bullying and violence described in Defendants' article, nor did Defendants give me the opportunity to do so."

Crediting (as we must for anti-SLAPP purposes) Nelson's account of the interview, we conclude that Dohrmann's statement that Nelson confirmed some of the incidents described by the article and expressed regret would support a finding of actual malice. As in *Masson*, the alleged falsity is not the words spoken by Nelson, but the context in which the words are placed. As reported by Dohrmann, Nelson appears to be admitting and apologizing for each of the incidents described in the article. But Nelson says these incidents never happened and more significantly for our analysis that Dohrmann never asked him about them. Although Nelson concedes he made the quoted statement, he says it was in response to Dohrmann's inquiry as to how he felt about his suspension and expulsion from the team, not an inquiry about the particular incidents described in the article. This difference is material because it significantly changes the meaning of Nelson's admission and apology. As such, it would support a finding of actual malice.

Defendants contend the quoted material is insufficient to support a cause of action for defamation because "there is no issue here of an alteration of a quotation at all. Nelson says the *meaning* of the quotations was distorted, but he cites no authority for the proposition that a dispute over the meaning of a quotation is sufficient to show actual malice where the quotation was not altered." (Internal record reference omitted.) We believe *Masson* is precisely such authority. As in *Masson*, the alleged falsity is not the quoted words themselves but the *context* in which the quoted words are placed, such that they appear to mean something Nelson said they did not. As in *Masson*, therefore, the alteration, if it occurred, is sufficient to support Nelson's defamation claim.

Citing *Christian Research*, *supra*, 148 Cal.App.4th 71, defendants also contend that Nelson's declaration was insufficient to establish that Dohrmann subjectively knew that the quoted statement was limited to certain events. In other words, defendants claim that even if Nelson's declaration establishes what Nelson *actually said* to Dohrmann, it

38

cannot establish what Dohrmann *heard or understood*, and thus it cannot prove that Dohrmann intentionally misrepresented the conversation.

We do not agree. In *Christian Research*, Christian Research Institute (CRI) and its president, Hank Hanegraaff, sued for defamation after defendant published an article stating that Hanegraaff "'has become the focus of a federal criminal mail fraud investigation.'" (*Christian Research*, *supra*, 148 Cal.App.4th at p. 77.) The plaintiff filed an anti-SLAPP motion supported by his own declaration stating, among other things, that before printing the article, he had called the Pasadena postal inspector's office and spoken with "Debra," who said her office was "investigating" a statement by CRI "'on the basis of "mail fraud."'" (*Ibid.*) In opposition to the motion, CRI submitted copies of letters received from the Office of the Inspector General (OIG) of the United States Postal Service (USPS) and other agencies in response to Freedom of Information Act (FOIA) requests; each letter said that the agency had no investigative records concerning defendant. (*Id.* at p. 79.)

The Court of Appeal held that CRI's evidence did not establish actual malice because, although the FOIA response gave rise to an inference that the defendant fabricated his conversation with "Debra," the inference lacked sufficient strength to meet the clear and convincing standard. It explained: "[T]he USPS FOIA response does not unequivocally state the USPS has no documents concerning an investigation of either of the plaintiffs, but only that the responder 'could not locate any records' of any investigation in her search of the 'USPS OIG, Investigations Office and the Hotline complaint desk . . . .' Thus, the response does not purport to foreclose the possibility that documents pertaining to the investigation Debra mentioned may exist, but are kept in a location other than those searched. [¶] The USPS FOIA response also does not negate the possibility that [defendant] simply misunderstood Debra. Specifically, Debra's statement that 'she was aware of the claims in [plaintiff's] fundraising letter and that her office was "investigating" it on the basis of "mail fraud,"' was ambiguous. One could reasonably interpret the statement to mean either that her office was investigating whether the purported misdirection of mail described in the CRI fundraising letter

39

constituted mail fraud, or was investigating whether the letter itself constituted mail fraud." (*Christian Research*, *supra*, 148 Cal.App.4th at pp. 87-88, fn. omitted.) The court noted, however, that the actual malice barrier "although formidable, is not insurmountable," and suggested that plaintiffs "might have met their burden, for example, by submitting a declaration from an official at the Pasadena postal inspector's office that no one named Debra [the employee with whom defendant said he spoke] worked there during the time in question, or a declaration from Debra stating she spoke with [defendant] but did not tell him her office was investigating the CRI letter." (*Id.* at p. 93.)

Assuming without deciding that the actual malice barrier is as "formidable" as *Christian Research* suggests, we conclude it was met here. As we have said, *Christian Research* suggested that plaintiffs could have met their burden by submitting Debra's declaration "stating she spoke with [defendant] but did not tell him her office was investigating the CRI letter." (*Christian Research*, *supra*, 148 Cal.App.4th at p. 93.) That is, in effect, what Nelson did in the present case—he submitted a declaration stating that he spoke with Dohrmann but did not say what Dohrmann claimed he said. His statement is sufficient to support an inference that Dohrmann must have known that the quoted statement was limited to certain events. That is, if in fact Dohrmann never asked Nelson about any of the specific incidents, Dohrmann had to have known that Nelson's admission and apology *could not* have referred to those incidents.

"*Stalk his targets.*" The article says Nelson did not deny stalking teammates on the court: "Nelson often reacted to hard fouls or calls against him in practice by committing violent acts against teammates. He did not deny to [Sports Illustrated] that he would stalk his targets, even running across the court, away from a play, to hit someone."

Nelson says this description misrepresents the interview: "[Dohrmann] did not reference or ask me about his to-be-published characterization of me as 'a classic bully, targeting teammates who weren't as athletically gifted as he and tormenting the support staff,' the 'one player [who] intentionally injured teammates but received no punishment,' someone who 'often reacted to hard fouls or calls against him in practice by

40

committing violent acts against teammates' and someone who 'stalk[ed] his targets, even running across the court, away from a play, to hit someone.'"

The article suggests that Nelson was asked about and failed to deny "stalk[ing]" teammates; Nelson's declaration says he was never asked about the alleged "stalk[ing]" and thus had no opportunity to deny it. The difference is material and, if credited by a jury, could support a finding of malice.

*Honeycutt urination incident*: According to the article, "[w]hen asked by [Sports Illustrated] about the [Honeycutt urination incident], Nelson said, 'I would dispute that that is exactly what happened, but I understand people would say that is what happened. But I think, most of all, you should know that Tyler [Honeycutt] and I are still friends.'"

Nelson's declaration says the following about this incident: "At the end of our telephone conversation, Dohrmann told me that he had 'heard' that I had urinated on Tyler Honeycutt's bed and clothing on New Years' Eve. I interrupted him and asked him why he would believe such a story. I told him that the story was nonsense and made absolutely no logical sense. I told him that nothing of the sort happened, that I have never done and would never do such a thing, and that Honeycutt and I remained friends to this day. Dohrmann paused, and I felt that he was not pleased with my answer. Dohrmann then abruptly thanked me for my time and ended the telephone call. I never heard from him again, nor did anyone else contact me on Defendants' behalf with respect to this article prior to its publication."[14]

---

[14]    We do not mean to suggest, of course, that reporting the alleged incidents in the face of plaintiff's express denial by itself establishes malice. To the contrary: "[D]enials alone do not establish malice. '[T]he press need not accept "denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." [Citation.]' (*Harte-Hanks Communications v. Connaughton* [(1989)] 491 U.S. [657,] 692, fn. 37.) 'A denial only serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality.' (Smolla, Law of Defamation

(Fn. continued.)

41

If Nelson's account is credited, it could support a finding of actual malice. The claimed alteration is subtle, but significant: Although Nelson says he firmly denied the story, telling Dohrmann that "nothing of the sort happened," the article suggests that Nelson's denial was far more ambiguous ("'I would dispute that that is *exactly* what happened'") and that Nelson admitted that "'I understand people would say that is what happened.'" Because the difference is material, it could support a finding of actual malice.

### (c) Defendants' declarations do not prove absence of actual malice

Defendants contend that the detailed declarations of Dohrmann and Schecter established that defendants "subjectively and justifiably believed the Article's statements about Nelson were true." Most of the statements in the declarations on which defendants rely—use of multiple sources, call log, review of other published sources, attempts to contact other UCLA players, review by editors, and fact-checking consistent with Sports Illustrated's standard practices—are relevant to defendants' reasonable belief in the accuracy of the third party accounts of Nelson's misconduct, *not* Nelson's asserted admission and apology. The only exception is Dohrmann's and Schecter's statements that when the article was published, they subjectively believed that all the statements contained in the article were truthful and substantiated. While this state-of-mind testimony is relevant to actual malice, it is not conclusive. (E.g., *People v. Harbert* (2009) 170 Cal.App.4th 42, 58 [jury was entitled to reject defendant's testimony as to his state of mind].)

Defendants cited *Christian Research*, *supra*, 148 Cal.App.4th 71, for the proposition that to defeat the anti-SLAPP motion, Nelson must negate even the *possibility* that the article's alleged misstatements resulted from an innocent

---

(2d ed. 2009) § 3:65.50, p. 3-96, fn. omitted.)" (*Young v. CBS Broadcasting, Inc.* (2012) 212 Cal.App.4th 551, 564.)

misunderstanding, rather than a deliberate falsification.  We do not agree that the plaintiff's burden is as high as defendants suggest.  To require a plaintiff to negate the possibility that a misstatement was made without malice before any discovery has taken place would, in effect, permit a defamation defendant to prevail on an anti-SLAPP motion merely by attesting to the lack of malicious intent.  We do not believe this result is required by the "breathing space" granted the First Amendment.

   3.  <u>Because We Have Concluded That Nelson Demonstrated a Prima Facie Case of Actual Malice With Regard to His Own Statements to Dohrmann, We Need Not Address the Remainder of the Article's Alleged Defamatory Statements</u>

  To defeat defendants' anti-SLAPP motion, Nelson need not demonstrate that *every* alleged defamatory statement was made with actual malice.  "To satisfy the second prong [of the anti-SLAPP test], 'a plaintiff responding to an anti-SLAPP motion must "'state[] and substantiate[] a legally sufficient claim.'"  [Citation.]  Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'"  (*Wilson v. Parker*, *Covert & Chidester* (2002) 28 Cal.4th 811, 821.)"  (*Oasis West Realty*, *LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

  "'[N]ot every word of an allegedly defamatory publication has to be false and defamatory to sustain a libel action.  See *Masson*[, *supra*, 501 U.S. at p.] 510 (interpreting California law, the Court explained, "[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text . . . .").'  (*Kaelin v. Globe Communications Corp*. (9th Cir. 1998) 162 F.3d 1036, 1040.)  '"Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'  [Citations.]"  [Citation.]'  (*Hughes v. Hughes* (2004) 122 Cal.App.4th 931, 936.)  Or yet another way:  '[i]f any *material* part be not proved true, the plaintiff is entitled to damages in respect to that part.'  (*Shumate v. Johnson Publishing Co*. (1956)

43

139 Cal.App.2d 121, 132, italics added.)" (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 434-435 [on the basis of evidence that a single statement in longer internet post was false and defamatory, "plaintiffs succeeded in carrying their minimal burden under the anti-SLAPP statute as to probable merit of their libel claim"]; see also *Balzaga v. Fox News Network*, *LLC* (2009) 173 Cal.App.4th 1325, 1338 ["'not every word of an allegedly defamatory publication has to be false and defamatory to sustain a libel action. . . . "[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text."'"].)

As we have said, Nelson has demonstrated a prima facie case of actual malice with regard to Nelson's alleged statements to Dohrmann admitting to and apologizing for the misconduct the article describes. Having so concluded, we do not address whether Nelson has also shown malice with regard the remainder of the article's asserted defamatory statements.

## IV.    Remaining Causes of Action

### A.    False Light

The parties dispute whether actual malice is an element of plaintiff's false light claim: Defendants claim that malice is a necessary element of false light, while Nelson contends it is not. In light of our conclusion that Nelson has established a prima facie case of actual malice, we need not resolve the dispute.

### B.    Intentional Infliction of Emotional Distress

Nelson's opening brief sets out the elements of a cause of action for intentional infliction of emotional distress, but makes no substantive argument why the trial court erred in dismissing this cause of action. Any such argument therefore is forfeited. (See, e.g., *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324 ["[A]ppellant must not only present an analysis of the facts and legal authority on each point made, but must also support arguments with appropriate citations to the material facts in the record. If he fails to do so, the argument is forfeited."].)

44

## DISPOSITION

The order granting the special motion to strike and judgment are reversed with regard to the first and second causes of action for defamation and false light.  Plaintiff is awarded his costs on appeal.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


EDMON, J.[*]

We concur:


WILLHITE, Acting P. J.


MANELLA, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.